Slip Op. 13 – 66

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| ARCHER DANIELS MIDLAND COMPANY, CARGILL, INCORPORATED, and TATE & LYLE AMERICAS, LLC., | |
| Plaintiffs, | Before: Judith M. Barzilay, Senior Judge |
| v. | Consol. Court No. 11-00537 |
| UNITED STATES, | Public Version |
| Defendant, | |
| and | |
| YIXING-UNION BIOCHEMICAL CO., LTD., | |
| Defendant-Intervenor. | |

**<u>OPINION</u>**

[Plaintiffs' motion for judgment on the agency record is granted in part and denied in part. Consolidated Plaintiffs' motion for judgment on the agency record is granted in part and denied in part.]

Dated:  May 28, 2013

*King & Spalding LLP* (*Joseph W. Dorn* and *Patrick J. Togni*) for Plaintiffs Archer Daniels Midland Company, Cargill, Incorporated, and Tate & Lyle Americas LLC.

*Barnes, Richardson & Colburn, LLP* (*Michael S. Holton*, *Jeffrey S. Neeley*, and *Stephen W. Brophy*) for Consolidated Plaintiffs RZBC (Juxian) Co., Ltd., RZBC Co., Ltd., and RZBC Imp. & Exp. Co., Ltd.

*Stuart F. Delery*, Acting Assistant Attorney General; *Jeanne E. Davidson*, Director; *Patricia M. McCarthy*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Carrie A. Dunsmore*) for Defendant United States; *Matthew D. Walden*, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of Counsel.

*Drinker Biddle & Reath LLP* (*Richard P. Ferrin* and *Douglas J. Heffner*) for Defendant-Intervenor Yixing-Union Biochemical Co., Ltd.

BARZILAY, Senior Judge:  This matter comes before the court on the motions for

judgment on the agency record filed pursuant to USCIT Rule 56.2 by Plaintiffs Archer Daniels

Midland Company, Cargill, Incorporated, and Tate & Lyle Americas, LLC ("Petitioners") and

Consolidated Plaintiffs RZBC Co., Ltd. ("RZBC Co."), RZBC Import & Export Co., Ltd., and

RZBC (Juxian) Co., Ltd. ("RZBC Juxian") (collectively "RZBC").   The Petitioners and RZBC

seek review of the final results of the U.S. Department of Commerce's ("Commerce") first

administrative review of the countervailing duty order on citric acid and certain citrate salts from

the People's Republic of China ("PRC").  *See Citric Acid and Certain Citrate Salts from the*

*People's Republic of China: Final Results of Countervailing Duty Administrative Review*, 76

Fed. Reg. 77,206 (Dep't Commerce Dec. 12, 2011) ("*Final Results*").  The court has jurisdiction

over this matter pursuant to 28 U.S.C. § 1581(c) and Section 516A(a)(2)(B)(iii) of the Tariff Act

of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii).[1]  For the reasons set forth below the court

remands this matter to Commerce for a clearer explanation of its conclusion regarding the

countervailability of steam coal and to address the effect of different grades of sulfuric acid when

---

[1] Further citations to the Tariff Act of 1930 are to the relevant provisions of Title 19 of the United States Code, 2006 edition.

calculating a world market sulfuric acid benchmark price.  The court sustains Commerce's other

determinations.

## I.  STANDARD OF REVIEW

The court will sustain the "determinations, finding, or conclusions" made by Commerce

during an administrative review unless they are "unsupported by substantial evidence on the

record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  "Substantial

evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.'"  *U.S. Steel Corp. v. United States*, 621 F.3d 1351, 1357 (Fed. Cir. 2010) (quoting

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951).  "Even if it is possible to draw two

inconsistent conclusions from evidence in the record, such a possibility does not prevent

Commerce's determination from being supported by substantial evidence."  *Am. Silicon Techs. v.

United States*, 261 F.3d 1371, 1376 (Fed. Cir. 2001).  In other words, when substantial evidence

supports Commerce's findings the court may not substitute its judgment for that of the agency.

*See Inland Steel Indus., Inc. v. United States*, 188 F.3d 1349, 1359 (Fed. Cir. 1999).  For this

reason the "party challenging [Commerce's] determination under the substantial evidence

standard 'has chosen a course with a high barrier to reversal.'"  *Nippon Steel Corp. v. United

States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (quoting *Mitsubishi Heavy Indus., Ltd. v. United

States*, 275 F.3d 1056, 1060 (Fed. Cir. 2001)).

To determine whether Commerce's actions were in accordance with law, the court

applies the well-established framework set forth in *Chevron, U.S.A., Inc. v. Natural Res. Def.

Council, Inc.*, 467 U.S. 837, 842-43 (1984).  "The first step of the *Chevron* analysis is to

determine 'whether Congress has directly spoken to the precise question at issue.'"  *PSC

VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 763 (Fed. Cir. 2012) (quoting *Chevron*,

467 U.S. at 842).  If it has, the agency and the courts must give effect to Congress's intent.  *Id.*  If

Congress has not directly spoken to the precise question at issue, the agency has authority to fill

the legislative gap, and its interpretations "are given controlling weight unless they are arbitrary,

capricious, or manifestly contrary to statute."  *Chevron*, 467 U.S. at 844.

## II.  BACKGROUND

In 2009, Commerce issued a countervailing duty order on citric acid and certain citrate

salts from the PRC.  *See Citric Acid and Certain Citrate Salts from the People's Republic of

China*, 74 Fed. Reg. 25,703 (Dep't Commerce May 29, 2009) ("*CVD Order*").  Approximately

one year later, Commerce notified interested parties of the opportunity to request a review of the

*CVD Order* for the period September 19, 2008 through December 31, 2009.  *See Antidumping or

Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request

Administrative Review*, 75 Fed. Reg. 23,236 (Dep't Commerce May 3, 2010).  After receiving

multiple responses, Commerce initiated a review of the *CVD Order*, *see Initiation of

Antidumping and Countervailing Duty Administrative Reviews and Requests for Revocation in

Part*, 75 Fed. Reg. 37,759 (Dep't Commerce June 30, 2010), and selected RZBC and Defendant-

Intervenor Yixing-Union Biochemical Co., Ltd. ("Yixing") as respondents.  *See* Respondent

Selection Memo (Aug. 17, 2010), Public Record 21, Confidential Record 4.[2]

There were three subsidies addressed by Commerce that are at issue in this appeal – the

provision of both steam coal and sulfuric acid[3] for less than adequate remuneration ("LTAR"),

and long-term loans to RZBC from government sources.  After its initial review of the parties'

submissions, Commerce issued preliminary results concluding that the respondents had received

---

[2] Citations to the Public Record will hereafter be designated as "PR" and citations to the
Confidential Record will be designated as "CR."
[3] Steam coal and sulfuric acid are inputs used in the production of citric acid and citrate salts.

countervailable subsidies during the period of review.  *Citric Acid and Certain Citrate Salts from the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review*, 76 Fed. Reg. 33,219 (Dep't Commerce June 8, 2011) ("*Preliminary Results*").  In reaching this conclusion, Commerce determined that RZBC failed to provide the identities of all the companies that produced and supplied it with sulfuric acid.  Commerce further determined that the Government of China ("GOC") failed to provide ownership information for the companies producing and supplying sulfuric acid and steam coal.  This information would have allowed Commerce to determine whether these producers were "authorities" within the meaning of 19 U.S.C. § 1677(5)(B).  Concluding that RZBC and the GOC had failed to cooperate and that an adverse inference was warranted, Commerce assumed that the producers were, in fact, "authorities" who provided a financial contribution in the form of a provision of a good.  *Id.* at 33,222-23, 33,231.

Next, Commerce compared the price paid for these GOC-supplied inputs with benchmarks derived from world market prices and concluded that the steam coal and sulfuric acid were provided for less than adequate remuneration.  *Id.* at 33,232, 33,233-34.  Finally, addressing the final requirement of a countervailable subsidy, Commerce determined that these benefits were specific under 19 U.S.C. § 1677(5A)(D) because they were conferred on a limited number of industries.  *Id.* at 33,232, 33,234.

Commerce did not address loans received by RZBC in the *Preliminary Results* but subsequently issued a Preliminary Creditworthiness Determination (Dep't Commerce Sept. 29, 2011), PR 52, CR 42.  In alleging that RZBC received loans as a subsidy, the Petitioners asserted that RZBC was uncreditworthy during the years of 2006 through 2009.  *See* Petitioner's Allegations of RZBC's Uncreditworthiness (Apr. 26, 2011), PR 135, CR 43.  In the Preliminary

Creditworthiness Determination, Commerce first stated that due to ownership changes during the

relevant period, it would treat all of the RZBC companies as separate entities for 2006 and 2007

and as a collective entity for 2008 and 2009.  Turning to the merits of the Petitioners' allegations,

Commerce concluded that, due to "unprofitability, illiquidity, and relatively high leverage,"

RZBC Juxian was uncreditworthy in 2006.  Preliminary Creditworthiness Determination at 4-5.

Next, Commerce concluded that RZBC Co. was uncreditworthy in 2007 "due to its [[


]]."  *Id.* at 6.  Finally, while finding that the financial health of the combined RZBC

entities was improving in 2008 and 2009, Commerce ultimately determined that RZBC was

uncreditworthy in those years because it "was [[                    ]] and [[        ]] . . . ."  *Id.* at 8.

Commerce subsequently received additional comments and submissions from the parties

and ultimately issued the *Final Results*, which incorporated by reference a corrected Issues and

Decision Memorandum for the Final Results in the First Administrative Review of the

Countervailing Duty Order on Citric Acid and Certain Citrate Salts from the People's Republic

of China (Dep't Commerce Feb. 10, 2012), PR 90 ("Decision Memorandum").  Commerce also

issued a separate Final Creditworthiness Determination (Dep't Commerce Dec. 5, 2011), PR 77,

CR 63.  In the *Final Results*, Commerce changed its determination regarding the specificity of

the alleged steam coal subsidy.  *Final Results* at 77,208.  It noted that six industries purchase

steam coal directly - (1) Mining, (2) Manufacturing, (3) Electric Power, Gas and Water

Production and Supply, (4) Construction, (5) Transport, Storage and Post, and (6) Wholesale and

Resale Trades, Hotels and Catering Services.  Decision Memorandum at 50-51.  While

Commerce had also recounted these industries in the *Preliminary Results*, it now stated that upon

a closer examination, it determined that the list included a larger and more diverse number of

industries than originally thought.  Decision Memorandum at 51.  From this, Commerce

concluded that the steam coal subsidy was not *de jure*[4] specific.  *Id.*  Commerce further stated

that it did not have sufficient information to determine whether the alleged steam coal subsidy

was *de facto*[5] specific so it would "defer a decision on the program's countervailability to a

future administrative review."  *Final Results* at 77,208.

Turning to the sulfuric acid subsidy, Commerce maintained its conclusion that the

provision of sulfuric acid at LTAR was a countervailable subsidy.  However, after receiving

additional submissions from RZBC regarding the identity of the companies that supplied its

sulfuric acid, Commerce decided that RZBC had provided all of the information requested of it,

and that the application of adverse facts available ("AFA") to it was not warranted.  Decision

Memorandum at 70.  This change provided little practical benefit to RZBC, however, because

Commerce maintained its conclusion that the GOC had not provided requested ownership

information for the sulfuric acid producers that sold to RZBC.  *Id.*  Based on the application of

AFA, those producers would therefore still be treated as authorities.  *Id.*

Additionally, Commerce continued to rely on sulfuric acid benchmark prices derived

from world market prices, a "tier-two" benchmark under 19 C.F.R. § 351.511(a)(2).  Decision

Memorandum at 57-58.  The GOC and RZBC argued that Commerce should have used actual

transaction prices paid by RZBC for non-GOC sulfuric acid, a "tier-one" benchmark under 19

---

[4] A subsidy is *de jure* specific "[w]here the authority providing the subsidy, or the legislation pursuant to which the authority operates, expressly limits access to the subsidy to an enterprise or industry."  19 U.S.C. § 1677(5A)(D)(i).

[5] A subsidy is *de facto* specific if (1) the actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number; (2) an enterprise or industry is a predominant user of the subsidy; (3) and enterprise or industry receives a disproportionately large amount of the subsidy; or (4) the manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others.  19 U.S.C. § 1677(5A)(D)(iii)(I)-(IV).

C.F.R. § 351.511(a)(2).  While acknowledging that actual transactions prices were available,

Commerce cited information provided by the GOC to conclude that the GOC's extensive

involvement in the Chinese domestic market rendered the tier-one prices unreliable.

Specifically, the GOC data indicated that state-controlled sulfuric acid producers accounted for

56 percent and 54 percent of domestic production in 2008 and 2009 respectively.  *Id*. at 17.

Moreover, Commerce noted that domestic production accounted for 97.09 percent and 95.47

percent of domestic consumption respectively for those same years.  *Id.*  Based on this,

Commerce reasoned that it was appropriate to utilize tier-two prices.  *Id.* at 18.  Upon comparing

the benchmark prices to the prices paid by RZBC to its suppliers, Commerce determined that the

sulfuric acid was sold at LTAR, and a benefit was thereby conferred.  *Id.*

Regarding the creditworthiness determinations, Commerce maintained its findings that

RZBC Juxian was uncreditworthy in 2006 and that RZBC Co. was uncreditworthy in 2007.

Final Creditworthiness Determination at 8.  Commerce changed its determination regarding the

combined RZBC entity, however, and determined that the record established that RZBC was

creditworthy for the years 2008 and 2009.  *Id.* at 11-12.

## III.  ANALYSIS

### A.  Commerce's Steam Coal Determination

The Petitioners argue that Commerce's decision to defer making a determination

regarding the countervailability of the alleged steam coal subsidy was contrary to law.  19 C.F.R.

§ 351.311(c)(2) allows Commerce to "defer consideration of [a] newly discovered practice,

subsidy, or subsidy program until a subsequent administrative review, if any."  The Petitioners

assert, however, that deferral under this provision is not available to Commerce here because it

only applies when Commerce officials "discover or receive notice of a practice that appears to

provide a countervailable subsidy" during the course of an investigation or administrative

review.  19 C.F.R. § 351.311(a).  The Petitioners argue that Commerce did not "discover or

receive notice" of a possible subsidy during the course of this administrative review.  Rather, the

Petitioners timely filed new subsidy allegations, and Commerce concluded that these allegations

were sufficient to initiate an investigation of the steam coal subsidy.  That being the case,

Petitioners argue, Commerce was statutorily required under 19 U.S.C. § 1677d to issue a final

determination regarding the countervailability of the steam coal provision.

        In its brief, the Government agrees with the Petitioners regarding the inapplicability of

the deferral regulation, but states that its inapplicability results from the fact that Commerce

actually made a final determination.  According to the Government, Commerce determined that

because the record contained insufficient evidence of *de facto* specificity, there was no basis

upon which to determine that the steam coal was countervailable, and that the issue would be

revisited in a subsequent review.  Def. Br. at 41.  While the Government asserts that Commerce's

course of action in this regard was a final determination in accord with the law, it also argues that

it would have been unreasonable to either countervail the steam coal subsidy, or declare the

program not countervailable, without sufficient evidence on the record to make such a

determination.  *Id.*  Yixing joins the Government in arguing that Commerce's determination was

in accord with the law, but for a different reason.  Like the Petitioners, it argues that Commerce

deferred making a final determination, but its entire brief is devoted to the argument that this

deferral was justified under 19 C.F.R. § 351.311.

        As may be clear from the arguments set forth above, it is difficult to discern exactly what

action Commerce took with regard to the alleged steam coal subsidy, which the court must do for

the purpose of deciding what legal review to afford.  In some respects the *Final Results* reflect a

final determination on the issue; in others it appears that Commerce was attempting to defer

making a determination.  While the Government here argues that the deferral provisions of 19

C.F.R. § 351.311 are irrelevant because Commerce did not defer making a determination,

Commerce indicated below that it was deferring its determination regarding the

countervailability of the steam coal.  *See, e.g., Final Results* at 77,208 (Commerce "will have to

defer a decision on the program's countervailability to a future administrative review.");

Decision Memorandum at 51 ("Therefore, we are not able at this time to determine whether

steam coal is being provided by the GOC to a specific industry or enterprise or group of

industries or enterprises.  Instead, we intend to revisit the *de facto* specificity of this program in a

future review.").  This confusion is exacerbated by Commerce's failure to cite any authority for

its action.

         The court would necessarily undertake different analyses depending on what action was

actually taken by Commerce in the *Final Results*.  For example, if Commerce was relying on the

statutory and regulatory bases for deferral, its action would likely be reviewed under the *Chevron*

framework.  It also appears to the court that there is an interpretation of Commerce's action that

was not discussed by the parties.  Specifically, the bottom line effect of the *Final Results* is that

the subsidy rate imposed therein does not include a rate for steam coal sold at LTAR. *See Final

Results* at 77,208.  In an administrative review, this would normally be the result of a final

determination that the subsidy under consideration was not countervailable for the given period

of review.  Commerce, however, did not provide sufficient analysis of its specificity conclusion

to give such a determination meaningful review here.  *See Diamond Sawblades Mfrs. Coalition

v. United States*, 612 F.3d 1348, 1360-61 (Fed. Cir. 2010).  Given that Commerce's conclusion

does not contain sufficient analysis or explanation for the court to examine under either aspect of

the standard of review set forth in 19 U.S.C. § 1516a(b)(1)(B)(i), the court remands on this issue

so that the agency can better explain its conclusion regarding the countervailability of the alleged

steam coal provision.

## B.  Application of AFA

RZBC argues that Commerce's determination that its sulfuric acid producers were

authorities based on the application of AFA was contrary to law.  Once Commerce concluded

that RZBC fully cooperated in the investigation, RZBC asserts, imputing the GOC's failure to

cooperate to RZBC conflicted with the law.  Commerce's AFA finding regarding the GOC is not

challenged here.  Rather, the court must address whether, in a countervailing duty proceeding,

the application of AFA to a non-cooperating party may adversely impact a cooperating party.

The inquiry engaged in before applying AFA is well-established.  Commerce may use

facts otherwise available in the record if

> (1) necessary information is not available on the record, or
>
> (2) an interested party or any other person –
>> (A) withholds information that has been requested by the
>> administering authority or the Commission under this subtitle,
>> (B) fails to provide such information by the deadlines for
>> submission of the information or in the form and manner
>> requested, subject to subsections (c)(1) and (e) of section 1677m of
>> this title,
>> (C) significantly impedes a proceeding under this subtitle, or
>> (D) provides such information but the information cannot be
>> verified as provided in section 1677m(i) of this title.

19 U.S.C. § 1677e(a).  Once this determination regarding the use of facts otherwise available has

been made, Commerce may make an adverse inference in selecting facts adverse to the interests

of a party that "has failed to cooperate by not acting to the best of its ability to comply with a

request for information from [Commerce] . . . ."  19 U.S.C. § 1677e(b).  In challenging the *Final*

*Results*, RZBC relies on the principle that Commerce lacks "authority under 19 U.S.C. §

1677e(b) to use an inference that is adverse to a party to the proceeding absent a factual finding

that such party 'failed to cooperate by not acting to the best of its ability to comply with a request

for information.'"  *SFK USA, Inc. v. United States*, 33 CIT __, 675 F. Supp. 2d 1264, 1275

(2009) (quoting 19 U.S.C. § 1677e(b)).

Commerce asserts that it did not deviate from this principle, but that the adverse impact

to RZBC of the AFA finding is a function of the specific information sought in countervailing

duty cases.  19 U.S.C. § 1677(5)(B) sets forth the elements of a countervailable subsidy - "an

authority . . . provides a financial contribution . . . to a person and a benefit is thereby

conferred."[6]  Section 1677(5)(B) also states that "'authority' means a government of a country or

any public entity within the territory of the country."  Commerce, therefore, needed to determine

not only who RZBC's sulfuric acid producers were, but whether they were government- or

publicly-controlled as to satisfy the definition of "authority" under § 1677(5)(B).  Once

Commerce received RZBC's supplemental responses identifying its sulfuric acid producers,

Commerce concluded that "RZBC provided all the information requested of it and that the

application of AFA to RZBC is not warranted."  Decision Memorandum at 70.

Identifying RZBC's sulfuric acid producers, however, could not tell Commerce whether

those producers were authorities.  To make that determination, Commerce needed ownership

information.  To obtain the necessary information, Commerce issued questionnaires to the GOC

and described the GOC's responses as follows:

> [F]or certain suppliers, no information was submitted; for certain other suppliers
> that had some direct corporate ownership, the GOC failed to provide articles of
> association for each level of ownership, information as to whether any of the
> owners, members of the boards of directors or managers were also government
> officials or CCP ["Chinese Communist Party"] officials, or whether operational

---

[6] 19 U.S.C. § 1677(5)(A) contains the additional requirement that a countervailable subsidy be
"specific" as described in 19 U.S.C. § 1677(5A).

> and strategic decisions made by the management or boards of directors are subject
> to government review or approval; and for other suppliers that were directly
> owned by individuals, the GOC generally failed to address whether any of the
> owners, members of the boards of directors or managers were also government
> officials or CCP officials, or whether operational and strategic decisions made by
> the management or boards of directors are subject to government review or
> approval.

Decision Memorandum at 3.  The information the GOC failed to provide was relevant to whether

the producers identified by RZBC were "authorities" under § 1677(5)(B), and there is no

indication in the record that RZBC could have provided this information, or that it could have

been sought from any other source.  Accordingly, Commerce applied AFA and concluded that

RZBC's sulfuric acid producers were "authorities" within the meaning of 19 U.S.C. §

1677(5)(B).  *Id.* at 70.

These facts follow the previously articulated pattern that "[t]ypically, foreign

governments are in the best position to provide information regarding the administration of their

alleged subsidy programs . . . [and] respondent companies, on the other hand, will have

information pertaining to the existence and amount of the benefit conferred on them by the

program."*Essar Steel Ltd. v. United States*, 34 CIT __, 721 F. Supp. 2d 1285, 1297 (2010), *aff'd

in part and rev'd in part on other grounds*, 678 F.3d 1268 (Fed. Cir. 2012).  For this reason,

"[w]here the foreign government fails to act to the best of its ability, Commerce will usually find

that the government has provided a financial contribution to a specific industry."  *Id.* (citation

omitted).  The application of AFA to the GOC under such circumstances may adversely impact a

cooperating party, although Commerce should seek to avoid such impact if relevant information

exists elsewhere on the record.  *See Fine Furniture (Shanghai) Ltd. v. United States*, 36 CIT __,

865 F. Supp. 2d 1254, 1262 (2012).  However, absent alternative satisfactory evidence on the

record, it is in accord with the law for Commerce to apply AFA to the GOC even though a

cooperating party may be adversely impacted.  *See id.* (sustaining Commerce's application of

AFA based upon the GOC's failure to cooperate even though such application adversely

impacted a cooperating party); *see also GPX Intern. Tire Corp. v. United States*, 37 CIT __, 893

F. Supp. 2d 1296, 1333 (2013) (recognizing that in the countervailing duty context AFA can be

applied to the GOC even though it will collaterally impact a cooperating party).

Here, RZBC does not claim it could have provided the ownership information Commerce

requested from the GOC, so it would have been dependent on the GOC's responses on this point

whatever they had been.  As it was, the GOC failed to provide the requested information

resulting in the "authority" element of the § 1677(5)(B) analysis being decided by an application

of AFA.  An "authority" is only important in a countervailing duty analysis to the extent that it

confers a benefit on someone.  RZBC was that someone here, and Commerce's determination

was in accord with the law.

### C.  Use of Tier-Two Benchmark Prices

Once Commerce determined by application of AFA that an "authority" had provided

RZBC with sulfuric acid, it still needed to determine whether that provision conferred a benefit.

Where goods have been provided, Commerce will normally deem that provision as conferring a

benefit if it was provided at LTAR.  19 U.S.C. § 1677(5)(E)(iv).  An LTAR determination, in

turn, is made by comparing the price paid by the respondent to a market-determined benchmark

established under 19 C.F.R. § 351.511(a)(2).  This provision contains a series of market data tiers

which are applied in a descending order of preference.  A tier-one benchmark is established by

using prices "resulting from actual transactions in the country in question."  19 C.F.R. §

351.511(a)(2)(i).  When there are no usable tier-one prices, a tier-two benchmark is established

using an average of available, comparable world market prices.  19 C.F.R. § 351.511(a)(2)(ii).

RZBC argues that Commerce's decision to use tier-two benchmark prices rather than the

tier-one benchmark prices on the record was contrary to law and not supported by substantial

evidence.  It is important to note what is not challenged by RZBC.  RZBC does not take issue

with Commerce's use of any GOC-provided data, or the conclusion drawn from that data that

state- or collectively-controlled companies were predominant in the Chinese sulfuric acid

market.  Rather, RZBC states that Commerce "ignored" and "failed to consider" its sulfuric acid

purchases from foreign suppliers, and argues that this conflicts with Commerce's preference for

tier-one benchmark prices.  RZBC Br. At 23, 24.  RZBC also argues that the tier-two prices used

by Commerce did not take into account how prices can vary for different grades of sulfuric acid,

and that world market prices for industrial grade sulfuric acid, the type  purchased from PRC

suppliers, are actually close to PRC prices.  RZBC Br. At 24; *see also* Decision Memorandum at

56.

As to RZBC's first argument, the record is clear that Commerce considered RZBC's

purchases of sulfuric acid from non-GOC sources.  Commerce stated that "[b]eginning with tier-

one, we must determine whether the prices from actual sales transactions involving Chinese

buyers and sellers are significantly distorted."  Decision Memorandum at 17.  Commerce then

quoted its own regulations as a basis for its concerns over market distortion: "Where it is

reasonable to conclude that actual transaction prices are significantly distorted as a result of the

government's involvement in the market, we will resort to the next alternative {tier two} in the

hierarchy."  *Id.* (quoting *Preamble - Rules and Regulations: Countervailing Duties*, 63 Fed. Reg.

65,348, 65,377 (Dep't Commerce Nov. 25, 1998) ("*CVD Preamble*").  Commerce then cited

GOC data stating that state- or collectively-controlled producers accounted for over half of

domestic production in 2008 and 2009, and that domestic production accounted for over 95

percent of domestic consumption in those same years. *Id.* Commerce also noted that the GOC

had imposed an export tax on sulfuric acid from February 2008 until June 2009, and that such

practices can discourage exportation and increase domestic supply. *Id.* Taken together,

Commerce found that these practices triggered the concern set forth in the *CVD Preamble*, that

domestic and import prices were unreliable, and that reliance on tier-two prices was appropriate.

*Id.* at 17-18.

RZBC's argument that Commerce ignored actual transaction prices is therefore

contradicted by the Decision Memorandum.  Furthermore, arguing that Commerce utilized tier-

two benchmarks after ignoring the tier-one benchmarks it has preferred in prior proceedings

misrepresents both the determinations of Commerce and the relevant regulatory regime.  The fact

that tier-one benchmarks are preferred under 19 C.F.R. § 351.511 is agreed to by all the parties,

and that preference was expressly cited in the Final Determination.  *Id.* at 16-17.  However,

Commerce's duty to utilize tier-two prices when reliable tier-one prices are unavailable is well

established by the *CVD Preamble*, 19 C.F.R. § 351.511(a)(2)(ii), and prior decisions of this

court.  *See, e.g., Royal Thai Gov't v. United States*, 30 CIT 1072, 1080, 441 F. Supp. 2d 1350,

1359 (2006).  Finally, the court finds that the data that prompted Commerce to utilize tier-two

prices here was consistent with data in previous cases leading to utilization of tier-two prices.

*See Guangdong Wireking Housewares & Hardware Co., Ltd. v United States*, 37 CIT __, 900 F.

Supp. 2d 1362, 1380-82 (2013) (sustaining Commerce's use of tier-two prices when 47.97

percent of domestic production was state-controlled, imports comprised 1.53 percent of the

domestic market, and export tariffs were in place).  Accordingly, the court will sustain

Commerce's utilization of tier-two benchmark prices.

Regarding RZBC's claim that Commerce failed to consider world market prices for the same grade of sulfuric acid RZBC purchased, Commerce dismissed this argument as "untimely" and stated that RZBC did not take advantage of earlier opportunities during the proceedings to submit benchmark information. Decision Memorandum at 58. RZBC argues that this is incorrect, and points to its Rebuttal Comments Concerning Petitioners' Additional Subsidy Allegations (Dec. 27, 2010), PR 59, CR 15 ("Subsidy Rebuttal Comments"). In that filing, RZBC stated that the Petitioners' subsidy allegations included "generic and overly broad trade data for the sulfuric acid" which failed to "distinguish between concentration levels and grades of sulfuric acid, which have vastly different pricing." Subsidy Rebuttal Comments at 2. As an example, RZBC cited non-technical grades which it claims are sold in smaller quantities and at higher prices than the industrial grade sulfuric acid purchased by RZBC, and it attached non-technical grade pricing and grading information. *Id.*; *see also* RZBC's Administrative Case Brief. (Oct. 24, 2011), PR 58, CR 47, at 29.

In response, the Government argues that the information submitted by RZBC was inadequate for determining benchmark prices, especially when compared to the documentation submitted by Petitioners. The court notes, however, that while this may have been an appropriate conclusion for Commerce to reach after analyzing the submissions of RZBC and the Petitioners on this point, it is not the conclusion Commerce in fact reached. Rather, after apparently considering only RZBC's Administrative Case Brief, Commerce stated that RZBC's argument was untimely. Commerce never addressed the fact that RZBC had raised the argument and filed supporting documentation almost ten months earlier in its Subsidy Rebuttal Comments. It is unclear from the record whether Commerce was even aware of this earlier submission, and the court cannot sustain Commerce's use of the tier-two benchmark prices submitted by the

Petitioners if it is not clear that Commerce considered RZBC's submissions challenging those

prices. *See Canadian Wheat Bd. v. United States*, 641 F.3d 1344, 1349 (Fed. Cir. 2011) (noting

that "Commerce's action must be evaluated on the basis of what it said and did at the time, not

on its counsel's subsequent justification for the agency action made in litigation challenging it.").

        Additionally, both the Government and the Petitioners rely on the principle articulated in

*Essar* that the benchmark input prices being compared need not be "identical . . . [because]

Commerce's regulations require only that [the input price] be a comparable market-determined

price that would be available to the purchasers in the country at issue." *Essar*, 678 F.3d at 1273-

74. While it is true that 19 C.F.R. §351.511(a)(2) does not require that world market prices be

gathered from "identical" products, it does require that Commerce consider "factors affecting

comparability." 19 C.F.R. §351.511(a)(2)(ii). That is why the court of appeals followed the

sentence quoted above by saying it was satisfied that "Commerce properly took into account

factors affecting comparability in its selection of the benchmark." *Id.* at 1274; *see also Essar*,

721 F. Supp. 2d at 1294 (explaining the process by which Commerce compared products in

calculating a tier-two benchmark). This analysis did not occur here because Commerce wrongly

concluded that RZBC's arguments were untimely. Thus Commerce must inquire into

comparability on remand.

## D. Creditworthiness

        After subsidy allegations were made by the Petitioners, Commerce investigated loans

made to RZBC under the Shandong Province Tenth Five Year Plan, which established a policy

of lending to citric acid producers in the Shandong Province. Preliminary Creditworthiness

Determination at 2. Pursuant to 19 U.S.C. § 1677(5)(D)(i), loans received from an "authority"

can amount to a countervailable subsidy. "In the case of a loan, a benefit exists to the extent that

the amount a firm pays on the government-provided loan is less than the amount the firm would

pay on a comparable commercial loan(s) *that the firm could actually obtain on the market*."  19

C.F.R. § 351.505(a)(1) (emphasis added).  When there is a question regarding whether the firm,

here RZBC, could have actually obtained the loans at issue, Commerce will undertake an

examination of the firm's creditworthiness.  Commerce "will consider a firm to be

uncreditworthy if [it] determines that, based on information available at the time of the

government-provided loan, the firm could not have obtained long-term loans from conventional

commercial sources."  19 C.F.R. § 351.505(a)(4)(i).  When undertaking analysis of a firm's

creditworthiness,

> [Commerce] may examine, among other factors, the following:
>
> (A)  The receipt by the firm of comparable commercial long-term loans;
> (B)  The present and past financial health of the firm, as reflected in
> various financial indicators calculated from the firm's financial
> statements and accounts;
> (C)  The firm's recent past and present ability to meet its costs and fixed
> financial obligations with its cash flow; and
> (D)  Evidence of the firm's future financial position, such as market
> studies, country and industry economic forecasts, and project and loan
> appraisals prepared prior to the agreement between the lender and the
> firm on the terms of the loan.

*Id*.  As the regulatory language makes clear, Commerce has "flexibility and discretion in

determining which factors to consider and weigh in making its creditworthiness

decision."  *Saarstahl AG v. United States*, 21 CIT 1158, 1163, 984 F. Supp. 616, 620 (1997),

*aff'd in part and rev'd in part on other grounds*, 177 F.3d 1314 (Fed. Cir. 1999).  Commerce has

stated that, in undertaking this analysis, it "is essentially placing itself in the position of a

commercial bank at the time the long-term loan in question is being approved and asking, would

the bank make this loan?"  Final Creditworthiness Determination at 8.

The Petitioners and RZBC challenge of a number of findings made by Commerce in the

Final Creditworthiness Determination, and the court addresses each in turn below.

1. <u>Basis for 2006 and 2007 Determinations</u>

RZBC argues that Commerce's determinations that RZBC Juxian in 2006 and RZBC Co.

in 2007 were uncreditworthy were unsupported by substantial evidence in the record.  RZBC

begins this argument by paraphrasing Commerce to assert that "the standard is not whether

Commerce would give a loan, but whether a conventional commercial source would have given

the loan."   RZBC Br. at 11.  RZBC then states that "the record is devoid of any standards that

would explain how a conventional commercial bank may analyze a company's records when

issuing a long-term loan."   *Id.*  Finally, in addition to relying on this lack of standards, RZBC

argues that "Commerce failed to cite any record evidence in support of its analysis that a

conventional commercial bank would have concluded that RZBC Juxian and RZBC Co. were

uncreditworthy."  *Id.*

As an initial matter, the court notes that Commerce's attempt to clarify its role by

comparing its analysis to that of a commercial bank should not be read to impose a supra-

regulatory standard as RZBC seems to argue.  While the regulations establish the ability to

obtain long-term loans from commercial sources as the measure of creditworthiness, 19 C.F.R. §

351.505(a)(4)(i), this standard can be articulated as an inquiry into "whether the company will

generate sufficient income to be able to repay the loan, given all the other financial demands on

the company."  Pet. Resp. at 15.  Essentially, 19 C.F.R. § 351.505(a)(4)(i) directs Commerce to

analyze the loan recipient's ability to repay.  This provision grants to Commerce the authority to

make that determination, and to make it on "a cases-by-case basis," guided by, "among other

factors," the considerations articulated in 19 C.F.R. § 351.505(a)(4)(i)(A)-(D).  Because

commercial lenders normally make determinations like these, analogizing Commerce's role to

that of a commercial lender is helpful in understanding the analysis Commerce must undertake.

However, RZBC's insistence that Commerce, in making this analysis, must do so justifying each

step as one that would be taken by a commercial lender is simply without basis in the

regulations.

      In undertaking this analysis here, Commerce began by noting that RZBC had received

loans only from state-owned banks or short-term loans, and that there were therefore no long-

term commercial loans to consider under 19 C.F.R. § 351.505(a)(4)(i)(A).  Turning to the factors

set forth in 19 C.F.R. § 351.505(a)(4)(i)(B)-(D), Commerce considered RZBC's financial data

and trends for the relevant period, and compared that information to data from a peer group of

comparable companies.  Preliminary Creditworthiness Determination at 4.  Commerce used this

data to analyze the RZBC entities' current ratios,[7] quick ratios,[8] debt-to-equity ratios, debt-to-

asset ratios, and times interest earned ratios.[9]  In the Preliminary Creditworthiness

Determination, Commerce set forth specific numeric values for each of these ratios, as well as

what these values meant for the financial health and ability to meet obligations of RZBC Juxian

in 2006 and RZBC Co. in 2007.  *Id.* at 4-6.

      After receiving additional comments from the parties, Commerce maintained the

conclusion reached in the Preliminary Creditworthiness Determination that RZBC Juxian in

2006 and RZBC Co. in 2007 could not have obtained long-term loans from a conventional

commercial source.  Analyzing the 2006 data for RZBC Juxian, Commerce noted that its current

---

[7] A company's "current ratio" gauges its ability to pay short term obligations.  *Id.*
[8] A company's "quick ratio gauges" its ability to pay short term obligations with cash or assets that can be easily liquidated.  *Id.*
[9] The times interest earned ratio gauges a company's ability to pay its debts by comparing pre-tax income with interest payments.  *Id.* at 5.

ratio indicated that it [[                                                                      ], but its quick ratio

of [[      ] indicated that RZBC Juxian "[[                                        ]]" because of [[

                                        ]].  Final Creditworthiness Determination at 10.

RZBC also had a [[          ]] times interest earned ratio, indicating that RZBC Juxian's

[[                                                                            ]] *Id.*  Finally,

Commerce noted that "RZBC Juxian's [[                ]] income was [[          ] in 2006,

showing that RZBC Juxian was not profitable." *Id.*

 Regarding RZBC Co., Commerce noted that it had a [[          ]] net cash flow "from

operations show[ing] that the company's primary business activity was [[            ]] of

generating a positive return on investments."  Final Creditworthiness Determination at 11.

Commerce also noted that "RZBC Co. had [[

                                    ]." *Id.*

 Given the scope of the data considered by Commerce, its repeated explanations regarding

what that data meant for the companies' ability to repay, and the detailed attention given to the

parties' comments, the court does not agree with RZBC's characterization of Commerce's

determination as lacking in record support or devoid of standards.  The data cited by Commerce

paints a picture of two companies with questionable financial health and ability to meet their

financial obligations.  Commerce's conclusion that RZBC Juxian in 2006 and RZBC Co. in 2007

would not have been able to obtain a loan from a conventional commercial source, was therefore

a reasonable one, and it will be sustained by the court.

2. <u>Inclusion of Government Issued Loan in Analysis</u>

 RZBC argues that Commerce's decision to include the government loans at issue in its

financial analysis of the RZBC entities was contrary to law because, by definition, those loans

would not have been "information available at the time of the government-provided loan." See

19 C.F.R. 351.505(a)(4)(i). Citing no authority other than this regulatory provision, RZBC

argues that "[c]learly the critical moment at which a 'commercial bank' will make a

determination is based on the finances prior to receiving the loan, not after the loan already has

been made." RZBC Br. at 15. Failure to exclude the government loans from the financial data

considered, RZBC argues, skewed the companies' debt-to-equity ratio by making it appear that

the companies' would be taking on additional debt equal in amount to the government loan

already issued.

  In declining to exclude the loans at issue, Commerce stated that such an exclusion would

depart from previous practice, *see* Final Creditworthiness Determination at 5 (citing *Cold-Rolled

Carbon Steel Sheet from Argentina: Preliminary Affirmative Countervailing Duty

Determination*, 49 Fed. Reg. 5151 (Dep't of Commerce, Feb. 10, 1984)), and that such a practice

would "be unadministrable . . . [and] a nearly impossible exercise." *Id.* at 8. Commerce further

stated that a commercial lender "would necessarily examine a firm's projected financial ratios

after receipt of a loan" because the lender's priority "is to ensure that it will be repaid in full and

on time." *Id.*

  The court agrees. A borrower's financial health is of concern to a lender only when that

borrower has a loan to repay, and a borrower's ability to repay only becomes an issue once the

loan is made. There is nothing in 19 C.F.R. 351.505(a)(4)(i) that required Commerce to exclude

the government loans at issue from its consideration of RZBC's finances. Congress nowhere

speaks directly to this issue. The court will therefore defer to Commerce's interpretation of what

"information available at the time of the government-provided loan" could be considered unless

it is "arbitrary, capricious, or manifestly contrary to statute." *Chevron*, 467 U.S. at 844. RZBC's

argument on this point is unconvincing, and as already stated, Commerce's approach is

reasonable and consistent with the rest of the relevant regulatory regime.  The court will

therefore sustain Commerce's decision not to exclude the government loans at issue from its

analysis of RZBC's finances.

3.  RZBC Juxian's Project Appraisal

          In accord with 19 C.F.R. § 351.505(a)(4)(i)(D), Commerce requested from RZBC any

"studies, reports, and/or analyses" that would provide evidence of RZBC's future financial

health, in particular its future income and ability to make loan payments.  Fourth Supplemental

Questionnaire for RZBC at 3 (Dep't of Commerce, July 8, 2011).  In response, RZBC submitted

a document entitled 6000 MT/Year Pharmaceutical Good Quality Citric Acid and Citrate Project

– Feasible Research Report dated March 17, 2006.  RZBC's Fourth Supplemental Questionnaire

Response at 5, Ex. 3 (July 29, 2011), PR 203, CR 66 ("Project Appraisal").  Commerce noted

that the Project Appraisal provides data on RZBC Juxian's production projections.  Final

Creditworthiness Determination at 10.  Commerce determined that the Project Appraisal was not

probative of RZBC Juxian's creditworthiness because it contained insufficient evidence of the

company's future financial position, its sales and revenue, and the market conditions within

which RZBC Juxian would operate.  *Id.*  Commerce was also concerned that there was no

evidence that the Project Appraisal was independently prepared.  *Id.*

          RZBC argues that Commerce's decision not to credit the Project Appraisal as

establishing RZBC Juxian's creditworthiness was unsupported by substantial evidence and not in

accord with law.  RZBC asserts that Commerce's conclusion in the Final Creditworthiness

Determination conflicted with its finding in the Preliminary Creditworthiness Determination that

the Project Appraisal "showed a [[

]], an investment recovery period of [[        ] years, and a break-even point of [[

]].”  Preliminary Creditworthiness Determination at 5.  RZBC also argues that

Commerce's concern over the Project Appraisal's not being independently prepared has no basis

in the regulations.  Finally, RZBC asserts that Commerce's conclusion regarding future sales and

revenue and market conditions is contradicted by a section of the Project Appraisal entitled

"Market Forecast."

Regarding whether the Project Appraisal was independently prepared, the court notes that

the regulations do not require independent preparation and are silent on the issue altogether.

Therefore, Commerce may consider this lack of independence as a mark against the Project

Appraisal and this determination is not "arbitrary, capricious, or manifestly contrary to statute,"

*Chevron*, 467 U.S. at 844, and in fact seems well within the "flexibility and discretion" afforded

Commerce under the regulations governing creditworthiness determinations.  *Saarstahl,* 21 CIT

at 1163, 984 F. Supp. at 620.  The more important question, however, is how the Project

Appraisal fits into the creditworthiness analysis overall.  The Project Appraisal is relevant, if at

all, under 19 C.F.R. § 351.505(a)(4)(i)(D) to the extent it sheds light on RZBC Juxian's future

financial position.  As such, it was considered by Commerce alongside all of the other data

discussed above.  While RZBC's assertion that the Project Appraisal contains data indicating an

expansion of RZBC Juxian's production capabilities may be well-founded, there is nothing in the

Project Appraisal that renders Commerce's analysis so unsupported as to fall short of the

substantial evidence standard.  Both the Preliminary and Final Creditworthiness Determinations

make clear that Commerce gave more than a cursory consideration to the Project Appraisal.  *See*

*Legacy Classic Furniture, Inc. v. United States*, 35 CIT __, __, 807 F. Supp. 2d 1353, 1360

(2011) (remanding based on Commerce's "cursory" treatment of record evidence).  However,

upon considering the information contained in the Project Appraisal, Commerce gave more

weight to the extensive record evidence discussed above indicating RZBC Juxian's

"unprofitability, illiquidity, and relatively high leverage."  Preliminary Creditworthiness

Determination at 5.  Commerce's conclusion that the Project Appraisal did not overcome this

evidence to establish that RXBC Juxian could have received a long-term loan from a commercial

lender was reasonable, and it will be sustained by the court.

4.  <u>Treatment of RZBC Juxian as a New Company</u>

        In the Final Creditworthiness Determination, Commerce noted that RZBC Juxian was

founded in [[            ]], the same year for which its creditworthiness was being considered.

Final Creditworthiness Determination at 11.  Commerce noted that, in previous reviews, it had

considered "other factors, such as the financial health of parents and affiliates" when weighing

the creditworthiness of a new company.  *Id.*  Commerce further stated that it had considered such

evidence in this review "[w]here appropriate," but found it inconclusive.  RZBC characterizes

this as a failure by Commerce to treat RZBC Juxian as a newly-founded company, and argues

that this decision was unsupported by substantial evidence.

        RZBC's argument seems to boil down to an assertion that there is a "new company"

status that may be applied to newly-formed companies when their creditworthiness is being

considered.  *See* RZBC Br. at 17.  This assertion, however, has no basis in the regulations, in

Commerce's determinations in this case, or in previous determinations.  The question that

Commerce must answer in a creditworthiness analysis is clear - whether a company could have

obtained long-term loans from conventional commercial sources.  19 C.F.R. § 351.505(a)(4)(i).

To answer this question, Commerce may apply the factors set forth in 19 C.F.R. §

351.505(a)(4)(i)(A)-(D), or others it deems appropriate according to a proper exercise of its

"flexibility and discretion."  *Saarstahl,* 21 CIT at 1163, 984 F. Supp. at 620.

In the Final Creditworthiness Determination, Commerce did not handicap RZBC Juxian's

data and ratios based on its recent establishment.  Rather, in accord with its statement regarding

past practice, it considered the finances of RZBC Co. because it had a [[                           ]]

stake in RZBC Juxian.  Final Creditworthiness Determination at 11.  Commerce determined that

RZBC Co.'s finances did not bolster RZBC Juxian's creditworthiness.  RZBC Co. would itself

be deemed uncreditworthy for 20007 based upon consideration of its 2006 and 2007 financial

data, and from this Commerce surmised that RZBC Co. "was not [[

                                          ] in 2006."  *Id.*  The court concludes that

Commerce acted within the bounds of its regulatory discretion in considering data from RZBC

Co. based on RZBC Juxian's recent establishment, and that its conclusion upon weighing that

data was reasonable.  The court will sustain Commerce on this issue.

5.  RZBC's Creditworthiness in 2008 and 2009

In the Preliminary Creditworthiness Determination, despite noting some positive aspects

of RZBC's financial health for 2008 and 2009, Commerce ultimately found the combined

company to be uncreditworthy because it was "[[                           ]] and [[          ]]."

Preliminary Creditworthiness Determination at 8.  Commerce reconsidered this conclusion in the

Final Creditworthiness Determination.  While noting that RZBC's current and quick ratios were

low, Commerce cited other ratios and data indicating "[[

                      ]]," significantly improved profitability ratios, and debt ratios higher than peer

medians.  Final Creditworthiness Determination at 11.  Commerce also noted that RZBC was

"[[                                          ]]" with profit margins above peer medians.  *Id.*  All of this

led Commerce to conclude that RZBC could have obtained long-term loans from conventional

commercial sources in 2008 and 2009.

The Petitioners argue that this conclusion was contrary to law and unsupported by

substantial evidence because, in making it, Commerce considered information that was

unavailable at the time the government loans were made.  Specifically, the Petitioners note that

the government loans in question were issued to RZBC on March 31, 2008, March 27, 2009, and

June 11, 2009.  *See* RZBC New Subsidy Allegation Supplemental Questionnaire – Section B

Response, Exs. 1, 5, and 7 (Apr. 26, 2011), PR 134, CR 42.  The Petitioners further note that in

making its creditworthiness determination for the combined RZBC entity, Commerce considered

financial statements from the four RZBC companies.  These financial statements were submitted

to Commerce in a 2008 audit report dated [[                         ]] and a 2009 audit report dated

March 10, 2010.  Since the audit reports for each year were dated after the government loan for

that year was made, the Petitioners argue those audit reports were not "information available at

the time of the government-provided loan," 19 C.F.R. § 351.505(a)(4)(i), and therefore cannot

serve as the basis for a determination of whether RZBC was creditworthy for those years.

As Commerce argues, however, although the audit reports were compiled after the

government loans were made, those audit reports were compilations of financial statements from

each of the RZBC companies.  Those financial statements necessarily preexisted the audit reports

into which they were eventually compiled.  Commerce asserts, and the record contains no

indication otherwise, that the financial statements, or the information contained in them, were

available contemporaneously with the government loans being made.  In other words, at the time

the government loans were made, a conventional commercial lender could have reviewed the

information that was eventually compiled into the audit reports.  The important point is not the

format in which this information wass presented, but what the information indicates and when it would have been available.  The regulation prompts Commerce to consider only "information available at the time of the government provided loan," and makes no mention of the "documents" or information "sources" that may have been available.  Commerce's reliance on the audit reports comports with 19 C.F.R. § 351.505(a)(4)(i), and is reasonable given that those audit reports would have contained "information available at the time of the government-provided loan."

## III.  CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that the Petitioners' motion for judgment on the agency record is granted in part as set forth in the remand order below and denied in all other aspects; it is further

**ORDERED** that RZBC's motion for judgment on the agency record is granted in part as set forth in the remand order below and denied in all other aspects; it is further

**ORDERED** that this matter is remanded so that Commerce can provide a clearer explanation of its conclusion regarding the countervailability of steam coal; it is further

**ORDERED** that this matter is remanded so that Commerce can address the effect of different grades of sulfuric acid when calculating a world market sulfuric acid benchmark price; it is further

**ORDERED** that Commerce shall file its remand determination no later than July 29, 2013; it is further

**ORDERED** that the parties may file comments to the remand determination no later than August 30, 2013; and it is further

**ORDERED** that the parties may file responses to such comments no later than

September 16, 2013.

Dated:  <u>May 28, 2013</u>                  <u>/s/ Judith M. Barzilay</u>
           New York, NY                      Judith M. Barzilay, Senior Judge